2026 IL App (4th) 250717

NO. 4-25-0717

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 4, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Adams County |
| DEVIAK ROBERT DAILING, | ) | No. 24CF771 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles H.W. Burch, |
| | ) | Judge Presiding. |

---

JUSTICE DeARMOND delivered the judgment of the court, with opinion. Presiding Justice Steigmann and Justice Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1        In a May 2025 trial, a jury found defendant, Deviak Robert Dailing, guilty of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2024)), a Class 1 felony. Defendant afterwards moved for either judgment notwithstanding the verdict or a new trial, arguing the guilty verdict stood against the manifest weight of the evidence because the State did not establish his guilt beyond a reasonable doubt and the trial court erred in admitting improper opinion testimony from a police detective. The court denied the motion and sentenced defendant to 15 years' incarceration in the Illinois Department of Correction (DOC), followed by 3 years to natural life of mandatory supervised release (MSR).

¶ 2        On appeal, defendant challenges his conviction and sentence on three grounds: (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the trial court erred when

it allowed the State to elicit "expert-style" testimony from Detective Erik Cowick when he was not and could not have been qualified as an expert, and (3) the maximum sentence imposed by the court proved excessive. We disagree and affirm the conviction and sentence.

¶ 3                                    I. BACKGROUND

¶ 4            In November 2024, the State charged defendant by indictment with two counts of criminal sexual assault, Class 1 felonies (720 ILCS 5/11-1.20(a)(1), (b)(1) (West 2024)), alleging, on June 6, 2024, "he knowingly committed an act of sexual penetration with B.L.B., in that by the threat of or use of force [he] made contact with the sex organ of B.L.B with his penis" (count I), and he "made contact with the mouth of B.L.B. with his penis" (count II). The matter proceeded to a jury trial in May 2025.

¶ 5                                    A. B.L.B.'s Account

¶ 6            The State first called B.L.B., who testified she met defendant for the first time late in the evening on June 5, 2024, when he and two friends picked her up at her grandparents' house in Payson, Illinois. She left the house with several bags of food and clothes because she planned to stay with her friend, Shelby, for a few days. They drove to defendant's apartment in Quincy, Illinois. When they arrived, B.L.B., and the other passengers, Jaclyn Hardy and Carter Kramer, entered the apartment but defendant left to retrieve his bike. During the 20-to-30 minutes defendant was away, the three sat in the living room. When defendant returned, he grabbed a beer and sat by B.L.B. on the couch. She testified that all four sat there talking until she and defendant began kissing. At some point, defendant asked Carter and Jaclyn to leave the room, and they did. B.L.B. testified defendant then "pulled [her] over towards him and tried to put his dick in [her] mouth multiple times." She demonstrated how defendant used one hand to grab her neck and pull her to his side of the couch. His thumb was on one side of her neck, his

fingers on the other side, and his palm on her throat. B.L.B. testified she "tried to push him away and then he wouldn't stop, so [she] just let it happen." She explained, and demonstrated with gestures, how she tried to push him away by holding her hands up and pushing out. B.L.B. reiterated that she told defendant to stop, but he would not listen. She testified, "He kept putting [his penis] like up against my lips three times and I told him to stop and the fourth time I finally let it happen because he wouldn't stop." B.L.B. estimated defendant's penis was in her mouth for "[l]ess than two seconds."

¶ 7 B.L.B. testified defendant next "tried to stick his dick in [her] vagina." He took off her shorts and underwear and "pulled [her] on top of him" and put his penis inside her vagina for "[o]ne or two minutes." She recalled feeling uncomfortable and scared during the act. B.L.B. testified the assault ended when "he pulled out and went off," after which he left. B.L.B. subsequently "packed [her] stuff up and left."

¶ 8 She walked to a nearby gas station and called her grandmother to tell her what happened and ask for a ride. She then walked to Blessing Hospital. She arrived carrying her bags and wearing one shoe. She explained she did not go back to defendant's apartment to retrieve her shoe because she "didn't feel comfortable."

¶ 9 At the hospital, B.L.B. talked with a police officer and eventually agreed to undergo a sexual assault examination. At trial, B.L.B. identified defendant as the man who pushed his penis in her mouth and vagina.

¶ 10 During cross-examination, defense counsel highlighted inconsistencies between B.L.B.'s prior statements and her trial testimony by playing video clips from her police interviews. Some of those inconsistencies pertained to how long she kissed defendant, whether B.L.B. told anyone else she planned to stay at Shelby's house, whether she spoke with Jaclyn

after defendant put his penis her mouth but before the vaginal penetration, and whether defendant left the room between the oral and vaginal sex. Defense counsel also elicited testimony from B.L.B. that during the assault, she did not scream, kick, bite, fight, or call the police.

¶ 11　　　　On redirect examination, B.L.B. affirmed, "I kept telling [defendant] to stop and I put my hands up to try to stop him." She also confirmed defendant put his penis in her mouth and vagina after he put his hands on her neck.

¶ 12　　　　　　　　　　B. The Friends and Grandmother

¶ 13　　　　As part of its case-in-chief, the State called Jaclyn and Carter. Their testimony shared many similarities. Both testified that they, along with defendant, picked up B.L.B. in Payson, and all four went to defendant's apartment in Quincy late in the evening of June 5, 2024. Both testified that all four sat in the living room for a while, with Jaclyn and Carter sharing a recliner and defendant and B.L.B. sitting on the couch. Both testified they eventually left the living room, going first to the kitchen to cook hamburgers and then outside. Both testified that after they left defendant's living room, they did not see B.L.B. again that night. Both testified that, 10 or 15 minutes after they left the living room, defendant came outside and told them he was leaving. Finally, both testified they did not witness any sexual activity or choking between defendant and B.L.B.

¶ 14　　　　Their testimony differed slightly on few points. Jaclyn did not recall seeing defendant and B.L.B. kissing on the couch, whereas Carter remembered seeing them kissing. Carter also recalled all four playing a game in the living room before he and Jaclyn left. Carter's testimony also addressed his interactions with defendant months later. He testified that on October 31, 2024, "[defendant] told [him] to tell the truth." Specifically, defendant told Carter to

testify to being with him "the whole time" and that he saw what happened. Carter confirmed that was not the truth. Carter testified defendant described what happened between him and B.L.B. and, when asked if it sounded consensual, Carter answered, "Not really."

¶ 15        The State also called Martha B., B.L.B.'s grandmother. She testified B.L.B. left her house on June 5, 2024, at approximately 11:45 p.m. Martha recognized Jaclyn in the car but did not know the two men with her. She testified that at approximately 2:15 a.m. on June 6, 2024, she received a phone call from B.L.B., who "sounded upset" because of her "kind of quivery, kind of whimpery" voice. Martha testified B.L.B. told her what happened at defendant's apartment and asked her to come get her. She agreed to meet B.L.B. at Blessing Hospital.

¶ 16                          C. The Medical and DNA Evidence

¶ 17        While at the hospital, B.L.B. agreed to be examined. The State called the doctor and nurse who treated her. Dr. David Eckersley testified he worked as an emergency room physician at Blessing Hospital and affirmed he was on duty in the early morning hours of June 6, 2024. He examined B.L.B., who "reported that she had been assaulted by a male who had forced her to perform oral sex and vaginal sex and that she had been choked during the incident." B.L.B. denied having any neck pain. Dr. Eckersley testified he saw no evidence of physical injuries to B.L.B.'s neck. He confirmed that, based on his experience as an emergency room physician, injuries may not appear within one to two hours of a sexual assault. He testified, "Evidence of the injuries may occur later."

¶ 18        Amber Hoener testified she was employed as a registered nurse at Blessing Hospital and had completed specialized training as a sexual assault nurse. Hoener testified B.L.B. told her she had been raped by a man she did not know. She said the man repeatedly asked her for sex, and she said no. Hoener's report noted B.L.B. said, "He forced me to anyway

and he tried to get me to suck his dick and then he fucked me." B.L.B. also said, "He choked me, but I didn't pass out." Hoener testified she conducted a sexual assault examination on B.L.B. and observed no visible injuries. She opined, however, that injures could appear later, noting, "The human body is completely different for everybody, so there can be bruising that comes hours later, days later. It just varies for every single person." Hoener confirmed that, as part of the examination, she collected swabs from B.L.B.'s genitalia and body for testing. Hoener testified she completed the examination and sexual assault kit and provided the latter to law enforcement.

¶ 19 The State then called the two forensic scientists from the Illinois State Police who tested the swabs from the sexual assault kit. They testified the swabs from B.L.B.'s external genitalia contained male DNA, and testing revealed the "profile is approximately 19 septillion times more likely if it originated from [defendant] than if it originated from an unknown, unrelated individual." In simpler, nonstatistical terms, the DNA evidence provided "very strong support" for the conclusion the male DNA came from defendant. On cross-examination, defendant's counsel confirmed this.

¶ 20                                    D. Law Enforcement Evidence

¶ 21 B.L.B. talked with two law enforcement officers on June 6 and 7, 2024. The State called both as witnesses. Katie Hatch, a 10-year veteran police officer with the City of Quincy testified she responded to a call and encountered B.L.B. in Blessing Hospital's parking lot at approximately 2:30 a.m. on June 6. Hatch observed B.L.B. holding a few bags and wearing one shoe. Hatch testified she interviewed B.L.B. and, based on their conversation, she went to defendant's apartment to investigate.

¶ 22 The State's final witness was Cowick, who testified he was employed by the City of Quincy and the United States Army. He stated he had been a Quincy police officer for 10

years, serving as a patrol officer, a juvenile detective, and then a criminal detective. Cowick confirmed he was assigned B.L.B.'s case when he went on duty at 7:30 a.m. on June 6, 2024. He stated he interviewed B.L.B. at 1 p.m. and, based on her account, he looked at her neck. Cowick testified he took pictures of B.L.B.'s neck at 2 p.m. on June 6, and he identified those pictures as exhibit No. 8. He explained that he took the pictures because B.L.B. told him defendant choked her, and he observed injuries to her neck. This colloquy followed:

"Q. Detective Cowick, as part of your training, are you—both at the military and with the Quincy Police Department, do you receive training about injuries on victims.

A. Yes, ma'am.

Q. Tell us about that training.

A. Throughout my years of investigation as well as, you know, the medical training I've had here as well as being a combat lifesaver on the military side of things, I know that injuries such as bruising doesn't [*sic*] always appear right away. Sometimes it takes some time for it to show itself.

Q. And have you personally experienced that on cases that you've worked?

A. Yes, ma'am.

Q. In fact, as part of your training as a—I know more about the Quincy Police than the military, but with the Quincy Police Department, do you take follow-ups of injuries over multiple days of victims?

A. Yes.

Q. And is that because the injuries may not show up until later and may

become more pronounced as time goes on?

A. Exactly.

Q. Tell us what injuries you observed on [B.L.B.]"

At this point, defense counsel objected on foundation grounds.

¶ 23    During a sidebar in chambers, defense counsel argued, "[T]he foundation that was just laid does not show that [Cowick] has any experience with strangulation." Counsel further argued:

"[Cowick] just says I'm a cop for ten years and I have experience and that there's a theory. That doesn't live up to the *Frye* test that somehow injuries appear later. He said based on his experience injuries appear later, but there's no medical foundation for that that there's no experience. He didn't give any examples. He didn't say a lot of times I see people beforehand and then two days later they have marks on their neck. Foundation is just not there. There's really no basis."

The State countered that it laid a "more than adequate foundation" because Cowick's training and experience led him to take multiple photographs of injuries on multiple days. The trial court overruled the defense's objection, finding, based on the questions and responses regarding Cowick's training and experience as a police officer, there was an "adequate foundation to have the testimony and questions asked of him based on his observations or if this was consistent with either strangulation or finger marks, he can testify to that."

¶ 24    Back in open court, the State again asked Cowick what injuries he observed on B.L.B. He testified, "I noticed that on the left side of her neck there appeared to be some bruising." Cowick confirmed the bruising was consistent with how and where B.L.B. said she had been choked. The State next showed Cowick exhibit No. 9, which he identified as the photos

he took of B.L.B.'s neck at 2 p.m. on June 7, 2024. He testified that on June 7, he observed "the same marks that [he] had seen the day prior, but they were a little bit more defined and the bruising was a little bit more darker than they were the day before." He explained "more defined" meant "on her left side of her neck, there were three indications that [he] could see on the left side and they were consistent with what *** appeared to be what [he] believed to be fingerprints or fingers, the tips of fingers." He again confirmed those marks were consistent with where B.L.B. said defendant put his fingers on her neck. Cowick testified it was "fair to say" the pictures in exhibit Nos. 8 and 9 did not "completely depict[ ]" B.L.B.'s injuries because the bruises were harder to see in the pictures. He affirmed the bruising "was actually more pronounced" when he saw it in person, as compared to seeing it in pictures.

¶ 25 Cowick also testified he interviewed defendant on June 6, 2024, while wearing a body camera. With Cowick on the witness stand, the State introduced the video of that interview as exhibit No. 10 and played it for the jury. Defendant told Cowick he had never met B.L.B. before that night and he still did not know her name. He admitted to having oral sex with B.L.B. but denied having vaginal sex, saying, "She gave me some head and I told her to leave. I was shitfaced fucking drunk. That's not rape. I didn't rape nobody." He denied arguing or fighting with B.L.B. He repeated, "She gave me some head and I kicked her out."

¶ 26 On cross-examination, Cowick testified he observed bug bites on B.L.B.'s legs, neck, and face during their interview. He confirmed that when he and B.L.B. discussed the injuries to her neck, she referenced the bug bites. Cowick testified he went back to see B.L.B. on June 7 to see if her injuries "were more prominent the next day." He said, in his opinion, the injuries appeared worse on June 7. As for the pictures, Cowick opined, "I just think that you are able to see the bruising better in person. The pictures still showed the injuries of what I was

seeing. In person, I just could see them better." He testified he believed the pictures showed bruising consistent with fingerprints. He could not determine if the bruising proved B.L.B. had been choked and for how long. On redirect examination, Cowick pointed out for the jury the bruising he observed in the pictures from exhibit Nos. 8 and 9. With that, the State rested its case. The defense presented no evidence.

¶ 27 The jury returned a split verdict. It found defendant not guilty of count I (vaginal penetration by force) and guilty on count II (oral penetration by force). The trial court ordered a presentence investigation report and set the matter for sentencing.

¶ 28 Defendant filed a posttrial motion for either judgment notwithstanding the verdict or a new trial, arguing the State did not prove him guilty beyond a reasonable doubt because B.L.B. consented to oral sex, noting B.L.B. testified she " 'finally let it happen because he wouldn't stop.' " Defendant also argued Cowick's testimony about the bruising on B.L.B.'s neck was inadmissible. The trial court heard arguments on June 26, 2025, and denied the motion.

¶ 29 At the sentencing hearing on July 10, 2025, the parties confirmed they received the presentence reports and supplements. Neither party presented evidence in aggravation or mitigation. The State argued for the maximum 15-year sentence, followed by a term of MSR spanning 3 years to natural life. The defense argued for the minimum four-year sentence, noting defendant's history of mental illness, his and his family's history of substance abuse, his troubled and violent childhood, and the cost of incarcerating him.

¶ 30 Before pronouncing the sentence, the trial court asserted it considered the presentence investigation report, the addendum and attachments, counsels' arguments, defendant's statement, the relevant factors in aggravation and mitigation, and the trial evidence. Specifically, the court considered defendant's age, mental and physical health, "fairly significant

history of drug and substance abuse," and background and "fairly difficult upbringing." The court identified the "most significant aggravating factor" as "the significant criminal history on the part of the defendant." The court opined, "[T]he more criminal history you've accumulated in your life *** should lead to a result where there should be more severe consequences." It then listed defendant's prior convictions, recognizing that "most of the defendant's criminal history is—would best be characterized as violent crime." The court opined defendant's various crimes led him "to be merely doing a life sentence on an installment plan, and that is regrettable." It finally considered the nature and circumstances of this crime, deeming it a serious offense. The court explained it found a significant prison sentence was necessary to deter others and redress the serious offense. It sentenced defendant to 15 years in DOC, followed by 3 years to natural life of MSR.

¶ 31    Defendant opted against filing a motion to reconsider the sentence, and this appeal followed.

¶ 32                                II. ANALYSIS

¶ 33    Defendant raises three arguments on appeal: (1) the State failed to prove him guilty beyond a reasonable doubt because it did not prove force or lack of consent, (2) the trial court erroneously admitted "expert-style" testimony from Cowick, and (3) the 15-year sentence is excessive and does not account for mitigating factors. We address each argument in turn.

¶ 34                           A. Sufficiency of the Evidence

¶ 35    "The due process clause of the fourteenth amendment to the United States Constitution [(U.S. Const., amend. XIV)] requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting

*In re Winship*, 397 U.S. 358, 364 (1970)). When a defendant appeals his conviction by arguing the State produced insufficient evidence to satisfy this burden of proof, we do not retry the defendant. Rather, viewing the evidence in the light most favorable to the State, we consider whether any rational fact finder could have found the essential elements of the crime proved beyond a reasonable doubt. *People v. Dye*, 2026 IL App (4th) 241001, ¶ 53. "All reasonable inferences from the evidence must be drawn in favor of the State." *People v. Jones*, 2023 IL 127810, ¶ 28.

¶ 36       We likewise defer to the fact finder on "questions involving the weight of the evidence or the credibility of witnesses." *Jones*, 2023 IL 127810, ¶ 28. It is well-established law "that the testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). And so, we "will not reverse a conviction simply because the evidence is contradictory [citation] or because the defendant claims that a witness was not credible." *Siguenza-Brito*, 235 Ill. 2d at 228. We will reverse a conviction "only where the evidence is so unsatisfactory, unreasonable, or improbable that it raises a reasonable doubt as to the defendant's guilt." *Dye*, 2026 IL App (4th) 241001, ¶ 53.

¶ 37       To prove a defendant guilty beyond a reasonable doubt of criminal sexual assault, the State must establish two elements: (1) the defendant committed an act of sexual penetration (2) by force or threat of force. 720 ILCS 5/11-1.20(a)(1) (West 2024). If a defendant claims the victim consented to sexual penetration, then the State must also prove nonconsent beyond a reasonable doubt. *People v. Denbo*, 372 Ill. App. 3d 994, 1005 (2007). Here, considering the charges and defendant's affirmative defense, the State had to prove defendant penetrated B.L.B.'s mouth with his penis by use of force or threat of force, and B.L.B. did not consent to

oral sex. Defendant does not dispute the sexual penetration element, but he contests the force and consent elements.

¶ 38                                                    1. *Force and Consent*

¶ 39         "Force is the essence of the crime of rape." *People v. Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 74. Section 11-0.1 of the Criminal Code of 2012 (720 ILCS 5/11-0.1 (West 2024)) defines it accordingly:

> " 'Force or threat of force' means the use of force or violence or the threat of force or violence, including, but not limited to, the following situations:
>
>> (1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat; or
>>
>> (2) when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement."

Here, the State alleged defendant used actual force, not the threat of force, to assault B.L.B. The force element "refers to actions of the defendant that physically compel the victim to submit to the act of sexual penetration." *Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 74. It requires something more than the force inherent in the physical penetration of the sex act. *People v. Lamonica*, 2021 IL App (2d) 200136, ¶ 42. Instead, force involves "some kind of physical compulsion *** that causes the victim to submit to the penetration against their will." *Lamonica*, 2021 IL App (2d) 200136, ¶ 42. Force, therefore, "precede[s] the act of sexual penetration by at least some amount of time—seconds, minutes, whatever amount of time it takes to 'overcome' the victim." (Emphasis omitted.) *People v. Smith*, 2019 IL App (1st) 161246, ¶ 30. "There is no

- 13 -

definite standard setting forth the amount of force necessary to establish criminal sexual assault by the 'use of force,' and each case must be considered on its own facts." *Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 74.

¶ 40　　　　Consent from the victim acts as an affirmative defense to criminal sexual assault because it effectively rebuts the State's evidence of force. *Denbo*, 372 Ill. App. 3d at 1005. The Criminal Code of 2012 defines "consent" as "a freely given agreement to the act of sexual penetration or sexual conduct in question. Lack of verbal or physical resistance or submission by the victim resulting from the use of force or threat of force by the accused shall not constitute consent." 720 ILCS 5/11-0.1 (West 2024). Therefore, if one freely agrees and allows oneself to be sexually penetrated, one has not been forced. *Denbo*, 372 Ill. App. 3d at 1005.

¶ 41　　　　Consent and force are two sides of the same coin. Proving one disproves the other. Nevertheless, to secure a conviction of criminal sexual assault when the defendant raises consent as an affirmative defense, the State must prove beyond a reasonable doubt both force and nonconsent.

¶ 42　　　　　　　　　　　　　2. *This Case*

¶ 43　　　　Defendant contends "the State sought to establish force through the testimony of [B.L.B.] but [her] testimony was not enough to prove that [defendant] penetrated [B.L.B.'s] mouth by force." He also argues "the State presented insufficient evidence to disprove beyond a reasonable doubt that [B.L.B.] consented to have sex with [defendant]." Defendant concludes "there [was] no physical evidence or testimony indicating that [defendant] used force to compel [B.L.B.] to engage in oral sex, [so] his conviction should be reversed for lack of force." We disagree on all points, and we hold the State sufficiently proved with both testimony and physical evidence that defendant used force to sexually penetrate B.L.B.'s mouth without her consent.

¶ 44     The State presented evidence defendant grabbed B.L.B.'s neck before he inserted his penis in her mouth. Force naturally precedes sexual penetration. *Smith*, 2019 IL App (1st) 161246, ¶ 30. B.L.B. testified defendant pulled her towards him by grabbing her neck with one hand, and he "tried to put his dick in [her] mouth multiple times." She told him to stop, refused oral sex, and tried to push him away by putting her hands up and pushing out. She testified she eventually "just let it happen" because defendant would not stop. B.L.B. said defendant's penis was in her mouth for one or two seconds.

¶ 45     B.L.B. gave similar accounts to the medical professionals who treated her at Blessing Hospital. She told Dr. Eckersley and Hoener that defendant choked her before raping her. She gave similar statements to Hatch and Cowick.

¶ 46     At trial and on appeal, defendant has sought to undermine B.L.B.'s testimony and credibility. The defense impeached B.L.B. with her prior inconsistent statements, particularly her interview with Detective Cowick on June 7, 2024. In that recorded statement, B.L.B. said defendant grabbed her neck, *then* she talked with Jaclyn, *and after that* defendant asked her for oral sex, which she refused. But on cross-examination, B.L.B. did not recall Jaclyn being in the room when defendant grabbed her neck, and she did not recall talking to Jaclyn. Jaclyn's trial testimony aligned with B.L.B.'s testimony and not the June 7 statement. Jaclyn testified she did not see defendant touch B.L.B., nor did she testify that she talked with B.L.B. after she left the room. In urging the jury to believe B.L.B.'s June 7 statement, defendant argues the break in time negated the force defendant used by grabbing her neck. The jury saw and heard B.L.B.'s June 7 interview. It heard B.L.B.'s and Jaclyn's respective testimony. The guilty verdict indicated the jury believed the trial testimony over the June 7 statement. It was the jury's province to judge witness credibility and weigh evidence. See *Dye*, 2026 IL App (4th) 241001, ¶ 53. A guilty

verdict will not be reversed simply because the defense contradicted some of the State's evidence or undermined a witness's credibility. See *Siguenza-Brito*, 235 Ill. 2d at 228.

¶ 47 As for physical evidence, the photographs the State presented through exhibit Nos. 8 and 9 showed marks on B.L.B.'s neck. Cowick testified he took the photographs because he saw marks on her neck that appeared to be consistent with fingermarks from grabbing the neck. The defense cross-examined B.L.B. and Cowick about the pictures. It elicited testimony from Cowick that B.L.B. also had bug bites on her neck and body. Dr. Eckersley and Hoener testified they did not see marks on B.L.B.'s neck, but both acknowledged marks or bruising could appear later. On redirect examination, Detective Cowick pointed out to the jury what he believed were bruises from defendant's fingers on B.L.B.'s neck.

¶ 48 This evidence—despite the defense's attempts to refute or discredit it—allowed the jury to reasonably conclude defendant overcame B.L.B.'s will and resistance by grabbing her by the neck, pulling her to him, and repeatedly trying to put his penis in her mouth. The evidence further allowed the jury to find B.L.B. said no and tried to push him away, but she eventually surrendered to defendant's force. The jury, therefore, could find the State proved the force element beyond a reasonable doubt as it is defined by statute and case law. By his superior strength, defendant overcame B.L.B. See 720 ILCS 5/11-0.1 (West 2024) (defining "force" as overcoming the victim by using superior strength, size, physical restraint, or physical confinement). Put differently, by grabbing B.L.B.'s neck and pulling her to him, defendant used physical compulsion that caused B.L.B. to submit to sexual penetration. *Cf. Lamonica*, 2021 IL App (2d) 200136, ¶ 42. These actions amounted to more than the force inherent in penetrating B.L.B.'s mouth with his penis.

¶ 49 This same evidence also proved beyond a reasonable doubt that B.L.B. did not

consent to oral sex with defendant. The defense has emphasized the fact that B.L.B. did not fight back when defendant grabbed her and pulled her to him, and she did not scream for help from Jaclyn and Carter, who were nearby. She was not obligated to do so. "Lack of verbal or physical resistance or submission by the victim resulting from the use of force or threat of force by the accused shall not constitute consent." 720 ILCS 5/11-0.1 (West 2024). B.L.B. verbally rejected defendant's demands for oral sex, and she tried to push him away. This is not consent.

¶ 50　　　　The defense argues B.L.B. was not credible and so her testimony was insufficient to satisfy the State's burden of proof for either force or consent. However, other witnesses corroborated B.L.B.'s testimony. Jaclyn and Carter confirmed much of what B.L.B. said occurred between the four of them that evening. Carter testified that, based on defendant's version of events and his request for Carter to lie for him, he did not think what happened between defendant and B.L.B. was consensual. B.L.B.'s grandmother confirmed some of B.L.B.'s testimony and described B.L.B. as upset during their phone call. Ultimately, credibility determinations are not our purview. "It is the province of the jury as the finder of fact to determine the witnesses' credibility, and its finding is entitled to great weight." *Dye*, 2026 IL App (4th) 241001, ¶ 53. The jury obviously found B.L.B. and the other witnesses credible. "It is well settled that a criminal sexual assault conviction may be sustained on the victim's testimony alone." *People v. Carlson*, 278 Ill. App. 3d 515, 521 (1996). We will not disturb the jury's credibility determination.

¶ 51　　　　Viewing the evidence in the light most favorable to the State, we cannot conclude the State's evidence was "so unsatisfactory, unreasonable, or improbable that it raises a reasonable doubt as to the defendant's guilt." *Dye*, 2026 IL App (4th) 241001, ¶ 53. Based on the State's evidence, a rational jury could find the State proved beyond a reasonable doubt all the

elements of criminal sexual assault and disproved beyond a reasonable doubt defendant's affirmative defense of consent.

¶ 52                                    B. Opinion Testimony

¶ 53        Defendant next argues the trial court erred by allowing Cowick to give "expert-style" opinion testimony about the bruising on B.L.B.'s neck. Defendant maintains "the State presented Cowick to the jury as an expert when he was not and allowed him to give medical-style explanations without foundation." We disagree.

¶ 54        Illinois laws permits opinion testimony from lay or expert witnesses. Ill. Rs. Evid. 701, 702 (eff. Jan. 1, 2011). "Rule 701 of the Illinois Rules of Evidence sets forth the foundational requirements for an 'opinion' or 'inference' offered by a witness who is not testifying as an expert." *People v. Loggins*, 2019 IL App (1st) 160482, ¶ 79. Lay witness opinion testimony "must be confined to statements of fact of which the witness has personal knowledge." (Internal quotation marks omitted.) *People v. Risper*, 2020 IL App (1st) 160707, ¶ 35. The lay witness's "opinion must be based on his or her personal observations and recollections of concrete facts, not on specialized knowledge." *Risper*, 2020 IL App (1st) 160707, ¶ 35. Expert opinion testimony, by contrast, must be based on "scientific, technical, or other specialized knowledge [that] will assist the trier of fact," and it must come from a qualified witness. Ill. R. Evid. 702 (eff. Jan. 1, 2011).

¶ 55        The trial court enjoys broad discretion in admitting or excluding evidence, including opinion testimony, and its decision will not be disturbed unless it abuses that discretion. *People v. Walker*, 2021 IL App (4th) 190073, ¶ 19. A trial court abuses its discretion when its decision "is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. McDonald*, 2016 IL 118882, ¶ 32.

¶ 56                    1. *The Motion in Limine and Trial Objection*

¶ 57           Defense counsel sought to exclude or limit Cowick's testimony through a motion *in limine* filed on the third day of trial. Counsel also objected during trial. However, a careful review of the motion and trial objection reveal neither addressed the testimony about which defendant now complains. The motion *in limine* referenced "a false accusation of strangulation" by the victim, and "[b]ased on prior experience with Officer Cowick," it sought to prohibit Cowick from giving "improper expert medical testimony." Such testimony included, but was not limited to, "the timing, causes, or interpretation of bruising." The motion hearing focused on Cowick's anticipated "strangulation testimony." The trial court limited Cowick's testimony to the photographs he took and his observations of "what he believed to be bruising and that based on his training and experience appeared to be evidence of strangulation *** that it is and may be consistent with choking." Cowick was neither questioned about nor testified to any of the above. On appeal, defendant raises no claim of error regarding the court's decision on the motion *in limine*. Instead, defendant confines his argument to the court's decision to overrule counsel's objection. We find the timing and substance of the defense's objection curious, to say the least.

¶ 58           At trial, Cowick had already testified to his training and experience. During direct examination, Cowick testified without objection that B.L.B. "indicated during that morning incident that she had been choked by defendant," and he observed injuries on her neck. He testified he took pictures of B.L.B.'s neck based on what she said and what he observed. He had already testified to his practice of taking follow-up pictures because injuries can worsen over time and bruising may not appear until later. Defense counsel did not object to any of these questions. Counsel did not object until the State asked, "Tell us what injuries you observed on [B.L.B.]" When counsel finally did object, he merely challenged the anticipated testimony's

foundation. During the in-chambers sidebar, counsel argued the State had laid an inadequate foundation to establish Cowick had experience with strangulation or injuries appearing in a delayed manner. As to the former, no questions had been asked of Cowick about strangulation, and the question to which the objection was made would not have elicited a response relevant to the objection. To the latter, Cowick had already testified, without objection, that in his experience, "injuries such as bruising doesn't always appear right away. Sometimes it takes some time for it to show itself." The jury had already heard the same thing from Dr. Eckersley and Hoener. The trial court overruled the objection, finding there was "adequate foundation to have the testimony and questions asked of him based on his observations or if this was consistent with either strangulation or finger marks, he can testify to that." With no other objection, Cowick testified he observed what appeared to be bruising on B.L.B.'s neck, consistent with where she said she was choked, and the bruises "appeared to be what [he] believed to be fingerprints or fingers, the tips of fingers." Cowick testified the location of the marks was consistent with where B.L.B. indicated defendant "had put his fingers on her neck," again without objection.

¶ 59        At oral argument, appellate counsel was questioned regarding whether the prior objection preserved the issue defendant now raises on appeal, specifically, that Cowick bolstered his testimony by referring to his military experience or opining that it provided him expertise regarding bruising. Defense counsel filed and argued defendant's motion *in limine* on the same day Cowick testified, so defendant cannot claim he was surprised by Cowick's testimony and failed to object quickly enough. In the motion and during the sidebar, counsel objected to any reference to strangulation, but Cowick made none. Counsel objected to Cowick relying on his training or experience to render or bolster an opinion as to how bruises were caused, but Cowick did not. Counsel objected to testimony from Cowick that bruising might change over time—

- 20 -

besides being an untimely objection, we will explain below that the testimony in question did not require expertise and was cumulative of medical testimony already before the jury. Counsel objected to any testimony from Cowick that the bruising on B.B.'s neck was caused by being choked, but he gave no such testimony. Cowick's testimony was limited to describing what he observed on B.L.B.'s neck.

¶ 60 Defendant's lone, broad foundational objection to an expansive question obfuscates what issue was actually preserved for appellate review. However, we need not determine whether defendant forfeited the precise argument he raises on appeal. Forfeiture binds the parties, not the courts. See *People v. Melvin*, 2023 IL App (4th) 220405, ¶ 11. This is an important issue, and we elect to address it. However, we take this opportunity to repeat the old maxim, "We will not reverse the trial court's decision based on an argument the trial court never heard." (Internal quotation marks omitted.) *People v. Kuehner*, 2022 IL App (4th) 200325, ¶ 132. We now turn to defendant's argument.

¶ 61 2. *Cowick's Testimony*

¶ 62 Defendant, relying on a concept unknown to Illinois jurisprudence, insists Cowick provided "expert-style" and "medical-like" testimony. We disagree. Cowick testified regarding his observations of B.L.B.'s neck and his interpretation of those observations based on his past experience. Cowick testified he observed "injuries on [B.L.B.'s] neck" while interviewing her on June 6 and June 7. Based on B.L.B.'s allegations that defendant choked her, Cowick looked at her neck and saw marks he believed looked like bruises. He took pictures of B.L.B.'s neck at approximately 2 p.m. on June 6. The State admitted those pictures as exhibit No. 8. Cowick then testified he interviewed B.L.B. again on June 7 at approximately 2 p.m., and he observed "the same marks that [he] had seen the day prior but they were a little bit more defined and the

bruising was a little bit more darker than they were the day before." He thought the marks "appeared to be what [he] believed to be fingerprints or fingers, the tips of fingers." He followed up by acknowledging the marks he observed "were consistent with where she told [him] the person who had sexually assaulted her had put his fingers on her neck." He identified those follow-up pictures as exhibit No. 9.

¶ 63 Notably, Cowick did not testify the marks he observed were consistent with choking or strangulation, and he did not speculate how much pressure for how much time would produce such marks. He simply testified to what he saw and the context in which he saw it, coupled with what B.L.B. told him had happened. Cowick's testimony fits squarely within Rule 701's parameters. He testified to his opinion or inference based upon his rational perception or personal observation of B.L.B.'s neck. See Ill. R. Evid. 701 (eff. Jan. 1, 2011); *Risper*, 2020 IL App (1st) 160707, ¶ 35. He did not base his testimony on specialized, technical, or scientific knowledge. See Ill. R. Evid. 702 (eff. Jan. 1, 2011).

¶ 64 Defendant highlights Cowick's testimony that he knew "that injuries such as bruising doesn't always appear right away," and "[s]ometimes it takes some time for it to show itself," based on his "years of investigation as well as *** the medical training [he] had here as well as being a combat lifesaver on the military side of things." He argues this statement laid an inadequate foundation for expert testimony and qualified Cowick's opinions as "expert-style" testimony. Defendant's brief isolates the term "combat lifesaver" five times to insinuate Cowick and the State repeatedly reminded the jury of his past training and experience to mislead them about his expertise. At oral argument, counsel went further, arguing Cowick told the jury they should rely on his prior experience. However, Cowick mentioned his experience as a "combat lifesaver" once, in the context of presenting his lay opinion on bruising. He did not invoke

- 22 -

scientific, medical, or specialized knowledge when describing what he observed when interviewing B.L.B. Recognizing a bruise is something an ordinary person does routinely. Understanding that a bruise may appear sometime after the initial injury is information firmly within the ordinary layperson's capacity. Regardless, the jury heard the same information from Dr. Eckersley and Hoener.

¶ 65      We find this case akin to *People v. Terrell*, 185 Ill. 2d 467 (1998). There, a police detective testified to his five-year experience in violent crimes involving sexual assault of children. *Terrell*, 185 Ill. 2d at 497. He testified he personally observed the victim's injuries and, in response to the State's question, said "he had never before seen injuries like those suffered by [the victim]." *Terrell*, 185 Ill. 2d at 497. The Illinois Supreme Court found "it [was] unnecessary to determine whether [the detective] was properly qualified as an expert witness because [his] testimony was an appropriate lay opinion." *Terrell*, 185 Ill. 2d at 497. The court explained the "testimony was based on [the detective's] personal observations and was helpful to the jury to clearly understand the extent of [the victim's] injuries and the amount of force required to inflict them." *Terrell*, 185 Ill. 2d at 497. The court held the trial court did not err in admitting the detective's testimony. *Terrell*, 185 Ill. 2d at 497. Likewise, we find Cowick's testimony constituted appropriate lay witness opinion testimony, as he testified to what he personally observed and aided the jury in evaluating the marks on B.L.B.'s neck. Consequently, we do not find the trial court's decision to admit Cowick's testimony to be unreasonable, arbitrary, or fanciful. See *McDonald*, 2016 IL 118882, ¶ 32. Therefore, it did not abuse its discretion. See *Walker*, 2021 IL App (4th) 190073, ¶ 19.

¶ 66                          C. Excessive Sentence

¶ 67      Finally, defendant argues "[t]he maximum sentence imposed by the trial court

- 23 -

was excessive where it failed to take into account the statutory mitigating factors relevant to [him]." We disagree.

¶ 68 "The trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Accordingly, we "may not alter a defendant's sentence absent an abuse of discretion by the trial court." *People v. Lawson*, 2018 IL App (4th) 170105, ¶ 26. The court abuses its discretion when the "sentencing decision is fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *Lawson*, 2018 IL App (4th) 170105, ¶ 28. For example, a sentence "will be deemed excessive and the result of an abuse of discretion by the trial court where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). We defer to the trial court in sentencing matters because it "is generally in a better position than the reviewing court to determine the appropriate sentence." *Stacey*, 193 Ill. 2d at 209. The court, for instance, can "observe[ ] the defendant and the proceedings" and consider factors like "the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." (Internal quotation marks omitted.) *Lawson*, 2018 IL App (4th) 170105, ¶ 33.

¶ 69 "The Illinois Constitution mandates '[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.' " *Lawson*, 2018 IL App (4th) 170105, ¶ 33 (quoting Ill. Const. 1970, art. I, § 11). The trial court must balance the retributive and rehabilitative purposes of punishment by carefully considering all the statutory factors in aggravation and mitigation. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002); see 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2024). The court,

however, is not required to explain in detail the exact process by which it determined the sentence. *Quintana*, 332 Ill. App. 3d at 109.

¶ 70　　　　Defendant failed to challenge his sentence in a postsentencing motion, which means he forfeited this argument. See *People v. Galarza*, 2023 IL 127678, ¶ 45 ("To preserve an error for consideration on appeal, a defendant must object to the error at trial and raise the error in a posttrial motion."). Defendant can bypass forfeiture by establishing a plain error occurred. *Galarza*, 2023 IL 127678, ¶ 45. Under the plain error doctrine, "the defendant must first demonstrate a clear and obvious error occurred." *Galarza*, 2023 IL 127678, ¶ 45. Only if a defendant meets that burden will we then consider whether (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) whether "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 48. We find no plain error.

¶ 71　　　　Defendant contends the 15-year sentence the trial court imposed was excessive because the court did not adequately consider his mental illness, the effect incarceration would have on his mental health, and his "difficult past and history." See 730 ILCS 5/5-5-3.1(a)(12), (16) (West 2024). The record refutes this claim. The court considered defendant's "health and condition, both physical and mental," and "the background of the defendant, and *** a fairly difficult upbringing, such that him being here today is really not that surprising." Likewise, the court considered the presentence investigation report and its supplements, which detailed defendant's mental health diagnoses and abusive childhood.

¶ 72　　　　Although it was not required to do so, the trial court explained why it imposed the

maximum 15-year sentence. The court deemed the weightiest sentencing factor to be defendant's significant criminal history. The court found it "appropriate to follow the reasoning and logic that the more criminal history you've accumulated in your life and that [defendant] has accumulated in his life should lead to a result where there should be more severe consequences, having accumulated this criminal history." The court recounted the escalating seriousness of defendant's past crimes, culminating in sexual assault. The court also observed defendant was on probation when he committed this offense, which indicated he could not "stay out of trouble." Finally, the court noted it considered the nature and circumstances of this offense and the seriousness of criminal sexual assault. It explained the 15-year sentence was necessary to punish defendant and protect the public, and a lesser sentence would deprecate the seriousness of this crime. The record, therefore, confirms the trial court carefully considered factors in aggravation and mitigation, as well as its observations of defendant throughout the proceedings. See *Quintana*, 332 Ill. App. 3d at 109. We cannot say defendant's sentence greatly varies from "the spirit and purpose of the law" or deem it "manifestly disproportionate to the nature of the offense," nor is it arbitrary, fanciful, or unreasonable. *Stacey*, 193 Ill. 2d at 210; *Lawson*, 2018 IL App (4th) 170105, ¶ 28. The court did not abuse its discretion in imposing the maximum sentence. Because there is no clear and obvious error, we will not consider whether plain error occurred.

¶ 73          Lastly, defendant suggests trial counsel's failure to file a postsentencing motion constituted ineffective assistance. He contends, "Counsel should have filed a motion to reconsider sentence arguing that [defendant's] troubled past and mental health issues, along with his rehabilitative potential indicate that his 15-year sentence of imprisonment was excessive." We can easily dispense with this argument.

- 26 -

¶ 74　　　　The Illinois and United States Constitutions guarantee criminal defendants the right to counsel, and the latter mandates "the right to counsel is the right to the effective assistance of counsel." (Internal quotation marks omitted.) *Strickland v. Washington*, 466 U.S. 668, 686 (1984); U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. When presented with a defendant's ineffective assistance of counsel claim, we apply the well-established, two-part *Strickland* test. *People v. Cherry*, 2016 IL 118728, ¶ 24. The defendant must prove (1) counsel rendered deficient performance, meaning counsel's representation fell below an objective standard of reasonableness as gauged by prevailing professional norms and (2) counsel's deficient performance prejudiced the defendant, *i.e.*, but for counsel's errors, the result of the proceeding would have been different. See *People v. Young*, 341 Ill. App. 3d 379, 383 (2003); *People v. Peck*, 2017 IL App (4th) 160410, ¶ 26. If a defendant fails to prove deficient performance, the court need not consider the prejudice prong, and vice versa. *People v. Torres*, 228 Ill. 2d 382, 395 (2008); *People v. Graham*, 206 Ill. 2d 465, 476 (2003).

¶ 75　　　　The record shows that once the trial court finished admonishing defendant on his appellate rights, counsel asked the court to direct the clerk to file a notice of appeal. The court asked counsel if he "want[ed] the opportunity to confer with your client" about filing a postsentencing motion. Counsel replied, "We've discussed it," and defendant wanted "to go straight to appeal." Defendant argues "counsel's decision to forgo a motion to reconsider sentence was prejudicial in light of the sentence imposed and the mitigating factors that were not adequately considered in this case." But counsel's decision did not prejudice defendant. In fact, it came after counsel conferred with his client and represented a conscious, tactical decision freely made by attorney and client. Ignoring the facts to assert a baseless claim of ineffectiveness is as much a disservice to the attorney as it is to defendant.

¶ 76    For the same reasons outlined above, because the trial court adequately considered the mitigating factors, we determine that even if counsel had filed a postsentencing motion, the result would not have been different. See *Peck*, 2017 IL App (4th) 160410, ¶ 26. There was no reasonable probability the court would have altered the sentence based on a supposed failure to consider mitigating factors because it already had considered defendant's mental health and difficult childhood. Because we find no prejudice, we need not address the deficient-performance prong. See *Torres*, 228 Ill. 2d at 395. Defendant did not receive ineffective assistance of counsel.

¶ 77                     III. CONCLUSION

¶ 78    For the reasons stated, we affirm the trial court's judgment.

¶ 79    Affirmed.

*People v. Dailing*, 2026 IL App (4th) 250717

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Adams County, No. 24-CF-771; the Hon. Charles H.W. Burch, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Adrienne E. Sloan, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Todd Eyler, State's Attorney, of Quincy (Patrick Delfino, Edward R. Psenicka, and Jenna Seaver, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |